1 | ROSE F. LUZON (SBN 221544)
KOLIN C. TANG (SBN 279834)
2 | **SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**
401 West A Street, Suite 2350
3 | San Diego, CA 92101
Telephone: (619) 235-2416
4 | Facsimile: (619) 234-7334
rluzon@sfmslaw.com
5 | ktang@sfmslaw.com

6 | ROSS B. BROOKS
ROLANDO G. MARQUEZ
7 | **SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
8 | New York, NY 10019
Telephone: (646) 402-5650
9 | Facsimile: (646) 402-5651
rbrooks@sanfordheisler.com
10 | rmarquez@sanfordheisler.com

```
         FILED

       AUG 2 0 2013

     CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                      DEPUTY
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, *ex rel.* VERONICA GLASER,

        Plaintiffs,

        v.

VIBRA HEALTHCARE LLC,
VIBRA HOSPITAL OF SAN DIEGO,

        Defendants.

CASE NO. '13 CV 1 8 8 5 GPC RBB

**UNDER SEAL Pursuant to 31 U.S.C. § 3730(b)(2)**

COMPLAINT

**DEMAND FOR JURY TRIAL**

1

2

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

3    I.    NATURE OF THE CASE ................................................................1

4    II.   PARTIES ......................................................................................2

5    III.  JURISDICTION AND VENUE .....................................................4

6    IV.   STATUTORY AND REGULATORY BACKGROUND ...................5

7          A.    The Medicare Program ........................................................5

8          B.    The Anti-Kickback Statute ..................................................6

9          C.    The Stark Act ......................................................................8

10         D.    Length of Stay Framework under Medicare .........................8

11                1.    "Greater than Three-Day Interruption of Stay" Policy ..............9

12                2.    "Three-Day or Less Interruption of Stay" Policy ....................10

13                3.    Six/Sixth's Stay Policy..................................................11

14   V.    DEFENDANTS' KICKBACKS AND FALSE CLAIMS ...........................12

15         A.    Defendants Pay for Patient Referrals by Providing Referring
16               Medical Directors Above-Market Consulting Fees ...........................12

17         B.    Defendants Manipulate Patients Length of Stay in LTCHs in
                 order to Overcharge Medicare for Patient Care. ...............................13

18                1.    "Greater than three-day" Interruption of Stay Scheme.............14

19                2.    The "Less than Three-Day" Interruption of Stay Scheme........16

20                3.    Six-Sixth's Stay Scheme ...............................................17

21   VI.   KNOWING CONDUCT .........................................................18

22   COUNT I Presenting False Claims  (False Claims Act, 31 U.S.C. §
23         3729(a)(1)(A)) ................................................................18

24   COUNT 2 Reporting False Claims (False ClaimsAct, 31 U.S.C. §
         3729(a)(1)(B)) ................................................................20

25   PRAYER FOR RELIEF..........................................................21

26   DEMAND FOR JURY TRIAL....................................................22

27

28

*Qui tam* Relator Veronica Glaser brings this action on her own behalf and on behalf of the United States of America to recover damages and penalties under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, against Defendants Vibra Healthcare LLC and its wholly owned subsidiary Vibra Hospital of San Diego. In support thereof, Relator alleges as follows:

## I.   NATURE OF THE CASE

1.   This is an action for treble damages and civil penalties arising from false or fraudulent reports and claims by Defendants in violation of the False Claims Act, the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and the Stark Act, 42 U.S.C. § 1395nn. Defendants provide above-market "consulting fees" to Vibra medical directors that are intended to remunerate and do remunerate the physicians for referring patients to Vibra's long-term care hospitals ("LTCHs"), in violation of the AKS and the Stark Act. As a result of these unlawful kickbacks and tainted referrals, Defendants submit or cause to be submitted false or fraudulent reports and claims for payment by Medicare. Defendants use their relationship with medical directors to manipulate patients' length of stay in Vibra LTCHs regardless of patient need in order to receive inflated Medicare payments.

2.   The FCA holds liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the United States, 31 U.S.C. § 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Violators are liable for civil penalties of at least $5,500 and up to $11,000 per violation, three times the damages sustained by the Government, and litigation costs. 31 U.S.C. § 3729(a)(1)(G), (3); 28 C.F.R. § 85.3(a)(9) (2010) (raising penalties from range of $5,000 to $10,000 to range of $5,500 to $11,000 to account for inflation).

3.     The FCA allows a person knowing of false or fraudulent claims or records presented to the United States to bring a private action on behalf of both the person and the Government, and to share in any recovery of money by or on behalf of the United States in the action. 31 U.S.C. § 3730. A prevailing relator is also entitled to attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

4.     Compliance with the Anti-Kickback Statute is a condition of payment by Medicare and a claim for Medicare reimbursement for items or services furnished or arranged in return for a kickback is a false claim under the FCA. 42 U.S.C. § 1320(a)-7b(g).

5.     Under the Stark Act, the government is prohibited from making any payments for health services which were provided as a result of an unlawful referral under the Act. 42 U.S.C. § 1395nn(g)(1).

6.     Based on these provisions, the Relator seeks treble damages and civil penalties arising from Defendants' knowing or reckless presentation of false reports and claims for payment by Medicare. The Relator has direct and independent knowledge that Defendants have violated and continue to violate the AKS, the Stark Act, and the FCA by (1) paying kickbacks to medical directors for referring patients to Defendant controlled LTCHs (2) using tainted self-referrals to obtain patients, and (3) fraudulently charging Federal health-care programs for patient expenses by manipulating the length of patients' stays and providing worthless services.

## II.     PARTIES

7.     Plaintiff **United States of America**, through its Department of Health and Human Services ("HHS") and that agency's Center for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled, commonly known as Medicare, under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*

8. Relator and Original Source **Veronica Glaser** is a citizen of the United States of America and a resident of California. She was employed by Vibra Hospital of San Diego as a Clinical Liaison from June 2012 until June 2013. As a result of her employment position, Relator brings this action alleging that the entire operation of Vibra's facilities is intended to, and does, serve the goal of maximizing Vibra's recovery of money from federal medical benefits programs rather than providing necessary and appropriate medical care to patients in need. Relator has direct and independent knowledge of Defendants' false claims to the Government, as alleged herein.

9. Defendant **Vibra Healthcare LLC** (hereinafter referred to as Vibra Corporate) is a Delaware corporation founded in 2004. Its principal place of business is located in Mechanicsburg, Pennsylvania. Vibra Corporate owns and operates 15 long-term acute care hospitals through the United States including in Thorton, Colorado; Boardman and Warren, Ohio; Lincoln Park, Michigan; Fort Wayne and Crown Point, Indiana; New Bedford, Massachusetts; Covington, Louisiana; DeSoto, New Braunfels, Luling, and Victoria, Texas; and Kentfield, Redding, and San Diego, California.

10. Defendant **Vibra Hospital of San Diego** (hereinafter referred to as Vibra San Diego) is a subsidiary of Vibra Healthcare LLC and is a Delaware corporation doing business in California. Vibra San Diego is a 110-bed long-term acute care hospital located at 555 Washington Street, San Diego, California 92103.

11. For allegations applicable to both these Defendants, they are collectively referred to herein as "Vibra."

12. Defendants are participating Medicare providers, and are reimbursed for services rendered to patients insured under the Medicare program. The overwhelming majority of patients admitted to Vibra are Medicare patients. Thus, the Medicare program constitutes a significant source of revenue for Defendants.

13.    In the pages of this Complaint, Relator alleges many schemes put in place by senior Vibra management to defraud the taxpayers of the United States.

## III.    JURISDICTION AND VENUE

14.    Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

15.    The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.*, and complained of herein took place in part in this district and the Defendants transacts business in this district.

16.    This action is not based upon prior public disclosure of the allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation; in news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

17.    To the extent there has been a public disclosure of any of Relator's allegations herein, she is the original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B).

18.    Pursuant to 31 U.S.C. § 3730(b)(2), Relator prepared and has served this Complaint on the Attorney General of the United States and the United States Attorney for the Southern District of California, with a written disclosure of all material evidence and information currently in her possession.  This disclosure statement is supported by material evidence known to Relator at the time of filing establishing the existence of Defendants' false claims.  Because the statements include attorney-client communications and work product of Relator's attorneys, and were submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relator understands these disclosures to be confidential

and exempt from disclosure under the Freedom of Information Act. 5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## IV.   STATUTORY AND REGULATORY BACKGROUND

### A.   The Medicare Program

19.    The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, was created in 1965 as part of the Social Security Act ("SSA"). The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Health Care Financing Administration ("HCFA"), a component of HHS.

20.    Medicare is a 100% federally subsidized health-insurance system for eligible Americans, including those aged 65 and over, certain disabled people, and certain people with chronic diseases who elect coverage. 42 U.S.C. § 1395c. The Medicare program consists of four parts, two of which are relevant to this Complaint. *See* 42 U.S.C. §§ 1395j-1395w. Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care. 42 U.S.C. § 1395c. Part B authorizes the payment of federal funds for medical and other health services, including without limitation physician services, supplies and services incident to physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services. 42 U.S.C §§§ 1395(k), 1395(i), 1395(s).

21.    To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance. 42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1).

22.    Reimbursement for Medicare claims is made by the United States through HHS. CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program. CMS, in turn, contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42

U.S.C. § 1395 (u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b). These entities are called fiscal intermediaries.

23.   Under the Medicare Program, CMS pays for LTCHs' operating and capital-related costs prospectively based on predetermined, fixed rates through the Prospective Payment Plan ("PPS"). 42 C.F.R. § 412.1(a)(1) (1992); 42 U.S.C. § 1395ww. The amount the LTCH receives for each patient is based on the rate assigned to that particular illness under the facility's classification system. 42 C.F.R. §§ 412.1, 412.60. The classification system used for LTCHs is the Medicare Severity Long-Term Care Diagnosis-Related Groups (MS-LTC-DRGs or DRGs). A patient's DRG is based on diagnoses, procedures performed, age, gender, and discharge status. 42 C.F.R. 412.60(c)(1). The DRG is also weighted to reflect the resources of the LTCH. 42 C.F.R. § 412.60(b).

**B.    The Anti-Kickback Statute**

24.   The Anti-Kickback Statute ("AKS") makes it a felony to, *inter alia*, knowingly pay or accept remuneration to induce anyone "to refer an individual to a person for the furnishing[,] or arranging for the furnishing[,] of any item or service for which payment may be made in whole or in part under the Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). The AKS thus holds liable both the person paying and the person accepting the kickback.

25.   Unlawful remuneration includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, for referrals, subject to specific exclusions none of which are applicable here. 42 U.S.C. § 1320a-7b(b)(1).

26.   The AKS is violated if *one* purpose of remuneration is to induce referrals, even if other, legitimate purposes are also present. 42 U.S.C. § 1320a-7b(b)(1)(A).

27.   A 2010 clarifying amendment of the AKS provides that "a claim [to a Federal health-care program] that includes items or services resulting from a

violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the False Claims Act. Patient Protection and Affordable Care Act, Pub. L. 111-148, § 6402, 124 Stat. 468, 759 (2010), codified at 42 U.S.C. § 1320a-7b(g). The same was true prior to the 2010 amendment.

28.     Providers participating in Medicare must annually certify compliance with the AKS. This certification is included in the CMS Form 2552 cost report that Providers submit each year, which is relied on by the federal Medicare program. The Certification reads as follows (emphasis in original):

MISREPRESENTATION     OR     FALSIFICATION     OF     ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, **IF SERVICES IDENTIFIED BY THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK** OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES, AND/OR IMPRISONMENT MAY RESULT.

CERTIFICATION     BY     OFFICER     OR     ADMINISTRATOR     OR PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by. . . (Provider Name(s) and Number(s)) for the cost reporting period beginning. . . and ending. . . and that to the best of my knowledge and belief it it's a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I** am familiar with the laws and regulations regarding the provision of health care services and **that the services identified in this cost report were provided in compliance with such laws and regulations**. (emphases added)

## C.    The Stark Act

29.    The Stark Act prohibits doctors from referring patients to a hospital with which they have a financial relationship. 42 U.S.C. § 1395nn(a).  "Financial relationship" is generally defined as a compensation arrangement between a physician and a medical provider or an ownership or investment interest in a medical entity. 42 U.S.C. 1395nn(a)(2) and (h)(1)(A).

30.    Under this Act, a healthcare provider is prohibited from submitting claims to the government for services rendered to patients referred in violation of the Act, and the government is prohibited from paying such claims. 42 U.S.C. § 1395(g)(1).

31.    The Act provides for limited exceptions, or safe harbors, to the self-referral prohibition, including, "personal services" and "bona-fide employment relationships." However, to take advantage of these safe harbors the payments made to the physicians must be fair market value. 42 U.S.C. § 1395(e)(2)(3).  Fair market value means the value in arm's length transactions, consistent with the general market value. 42 C.F.R. § 411.351.

## D.    Length of Stay Framework under Medicare

32.    An LTCH's fiscal responsibilities to their patients, and the payments they receive from the government, are adjusted based on each patient's length of stay and if the patient's stay is interrupted. An interrupted stay occurs when a patient is discharged from a LTCH for treatment and services not available at the LTCH, or to rest at home, and after a specific number of days away from the LTCH the patient is readmitted to the same LTCH for further medical treatment. 42 C.F.R. § 412.531. There are two types of interrupted stays for LTCHs: the original plan (the "greater than 3-day interruption of stay") and the expansion of the policy (the "3-day or less interruption of stay").  42 C.F.R. § 412.531(a)(1)-(2).

33.    In order to be considered an LTCH, a facility must have an average patient length of stay of greater than 25 days. 42 C.F.R. § 412.23(e)(2)(i).

### 1.    "Greater than Three-Day Interruption of Stay" Policy

34.    If an LTCH discharges a patient to an Inpatient Acute Care Hospital, an Inpatient Rehabilitation Facility ("IRF"), or an Skilled Nursing Facility ("SNF") and then readmits the patient *after* three days, but within the fixed time period required for the facility, the "greater than three-day" interruption of stay policy is applicable. 42 C.F.R. § 412.531(a)(2).

The following chart provides the fixed-day period for different types of facilities:

| Facility Type | Fixed-Day Period |
|---|---|
| Inpatient Acute Care Facility | Between 4 and 9 days |
| Inpatient Rehabilitation Facility | Between 4 and 27 days |
| Skilled Nursing Facility | Between 4 and 45 days |
| Swing Bed | Between 4 and 45 days of less |

If the greater than three-day interruption policy applies, the entire stay (including days spent at the LTCH before and after the interruption) is considered an interrupted stay and Medicare makes only one DRG payment to the LTCH. 42 C.F.R. § 412.531(b)(ii)(3)(B). If a patient's stay is interrupted for longer than the facility's fixed period, the LTCH is paid two DRG payments, one for the initial admission and another for the treatment after the last day of the fixed period. 42 C.F.R. § 412.531(b)(iii)(4).

35.    An example of a "greater than three-day interruption" involving a transfer from a LTCH to an Inpatient Acute Care Facility is described by CMS in its "Long Term Care Hospital PPS Interrupted Stay Info Sheet" as follows:

An LTCH admits a patient on Day 1 and discharges him or her to an inpatient acute care hospital on Day 8. The patient returns to the LTCH on Day 14. Because the time between the discharge to the inpatient acute care hospital and return to the LTCH is 7 days, the stay meets the fixed-day period requirement for inpatient acute care hospitals under the "Greater than 3-Day Interruption of Stay" policy. The first 8 days of the LTCH stay (Day 1 through Day 8) are added to the day count of the second portion of the LTCH stay. Depending on the accumulated LOS, the LTCH gets either an SSO [Short Stay Outlier] payment or a full MS-LTC-DRG payment for the case.

## 2.      "Three-Day or Less Interruption of Stay" Policy

36.     The "three-day or less interruption of stay" policy governs when a Medicare patient is discharged from a LTCH and then readmitted to the same LTCH within three days of the original discharge. 42 C.F.R. § 412.531(a)(1). As of July 2004, where a patient goes upon discharge does not affect the policy as long as the patient returns within the three-day time frame. The "three-day or less" period begins with the date of discharge from the LTCH and ends no later than midnight of the third day. 42 C.F.R. § 412.531(a)(1). During this three-day interruption the LTCH is responsible for any costs associated with tests, procedures, or care provided to the patient. The LTCH will only receive one DRG payment for the patient's stay. 42 C.F.R. § 412.531(b)(ii).

37.     An example of the "three-day or less" interruption of stay as described by CMS in its "CMS Interrupted Stay Fact Sheet" is as follows:

A patient is discharged from an LTCH on Day 1 and is immediately admitted to an acute care hospital. On Day 2, the patient is released from the acute care hospital and returns home. On Day 3, the patient is readmitted to the LTCH. The patient is discharged from the LTCH four weeks later. In this case, Medicare will pay for the entire stay, including the interruption, with one MS-LTC-DRG payment, which will be determined, based upon the patient's entire medical record, including diagnoses and treatment during the intervening hospitalization at the acute care hospital on Day 2 of the interruption. The LTCH will be responsible for paying the acute care hospital for the patient stay on Day 2 'under arrangements.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   Six/Sixth's Stay Policy

38.    In order to be classified as an LTCH, a facility must have an average patient length of stay of greater than 25 days. 42 C.F.R. § 412.23(e)(2)(i). To receive a full DRG payment, a patient's actual length of stay in the LTCH must exceed five-sixths of the average length of stay established by the patient's DRG. 42 C.F.R. § 412.531(b)(iii)(3).  Once the patient's stay passes the five-sixths mark, the LTCH receives a full DRG payment regardless of if the patient completes the length of stay suggested by their DRG. *Id.*

## V.   DEFENDANTS' KICKBACKS, FALSE CLAIMS, AND FALSE REPORTS

### A.   Defendants Pay Referring Medical Directors Above-Market Consulting Fees in Exchange for Patient Referrals

39.   Defendants compensate medical directors for referrals to Vibra San Diego by providing lucrative, above-market "consulting fees" to referring doctors. These consulting fees, however, are in fact nothing more than thinly veiled payments—kickbacks—for ongoing patient referrals. Vibra San Diego provides most of these kickbacks to medical directors who work as physicians at Scripps Mercy Hospital San Diego ("Scripps"), the acute care hospital that is the source of the majority of Vibra San Diego's Medicare patients. In particular, Vibra pays Medical Director Dr. John Fox wildly exorbitant and above-market consulting fees which Dr. Fox then distributes amongst other Scripps medical directors who take part in the referral scheme. Vibra currently has eight medical directors who are involved in this tainted referral scheme.

40.   Relator discussed this fraudulent kickback scheme with Vibra San Diego's recently appointed CEO Natalie Germuska. In or about May 2013, Ms. Germuska told Relator at a weekly briefing meeting that Vibra San Diego paid Dr. Fox approximately $80,000 per month in "consulting" fees in exchange for referring patients. Ms. Germuska expressed that Dr. Fox's fees were excessive and unwarranted. Ms. Germuska went on to say the consulting payments were out of line with the service that medical directors provide the LTCH.

41.    On its face, this referral is far above fair market value. Calculated on an annual basis, Vibra pays Dr. Fox $960,000 solely for referring patients to Vibra. Comparatively, physicians' compensation for *actual Medicare patient care* at the local LTCH Kindred Hospital is $24,108 a month, and $289,298 annually.

42.    Dr. Fox's interest in Vibra San Diego is not a bona fide, fair market value interest, but is in part a means for Vibra to pay him kickbacks for referring patients to Vibra San Diego. The Relator has observed this consulting fee scheme continue under the authority of four CEOs including: current CEO Natalie Germuska, current regional CEO Timothy Patten, and former CEOs Tim Clark and Michael Philips.

43.    In order to maintain the flow of these kickback payments, Scripps medical directors assist Vibra in manipulating its patients' length of stay by keeping patients in their acute care hospitals until the day on which Vibra will receive additional funds from Medicare. This concerted effort allows Vibra to control when patients will be readmitted to their LTCH and enables Vibra to profit from over payments paid by Medicare.

**B.    Defendants Manipulate Patients Length of Stay in LTCHs in order to Overcharge Medicare for Patient Care**

44.    Medicare patients represent the overwhelming majority of Vibra's patients. At all times during Relator's employment with Vibra, the availability of federal benefits was a primary consideration for the admission and discharge of patients. As a matter of corporate policy, Vibra makes admission and discharge decisions based on how Vibra will be paid rather than on what level of care patients need.

1. **"Greater than three-day" Interruption of Stay Scheme**

45.     In order to receive two DRG payments, which are generally $85,000, Vibra manipulates the length of time patients spend at other facilities. Under the "greater than three-day" scheme, Vibra instituted a policy that requires patients who have interrupted stays of greater than three days to remain outside of the LTCH for at least nine days if the patient is sent to an acute care hospital. Since Medicare only pays an additional DRG payment if a patient's length of stay is interrupted by more than nine days before readmission, Vibra instituted a policy that patients will not be readmitted to their LTCH until after this fixed period has elapsed.

46.     In furtherance of this policy, employees are instructed to list the ninth day of a Medicare patient's stay in weekly referral logs prior to the patient's admission into the LTCH. These dates are listed only on Medicare patient's charts, but not on patient's charts with private insurance, and are listed prior to admission to the LTCH. This is noted on referral logs as "LOA 9th day" and is followed by the date after which the patient can be readmitted with a new DRG payment. Representative examples of referral logs are below:

| Ref Date | Patient Name | Location | Referral Source | Coverage | Admit Date | Accepting MD | CL | Diagnosis | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 4/8 | Redacted | Mercy | Zawikowski | MCR/BC | | Martinez | JM | Code blue | LOA 4/8/13, day3 4/10/13 |

| Ref Date | Patient Name | Location | Referral Source | Coverage | Admit Date | Accepting MD | CL | Diagnosis | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 4/9 | Redacted | Mercy | GuhaRoy | MCR/MCAL | | GuhaRoy | JM | amputation | LOA 4/9/13, day3 4/11/13 |

| Ref Date | Patient Name | Location | Referral Source | Coverage | Admit Date | Accepting MD | CL | Diagnosis | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 1/10 | Redacted | Sharp Chula Vista | Brandon | MCR/Blue Shield | | Martinez | FV | Peritinitis | LOA 3days 1/13/13. 9th day 1/19/13 |

| Ref Date | Patient Name | Location | Referral Source | Coverage | Admit Date | Accepting MD | CL | Diagnosis | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 3/16 | Redacted | Sharp Memorial | | MCR | | Nguyen | DF | Hernia | LOA 3day 3/19/13. 9 day 3/25 |

| Ref Date | Patient Name | Location | Referral Source | Coverage | Admit Date | Accepting MD | CL | Diagnosis | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 6/3 | Redacted | Scripps Green | | UH/SCMG MR | | Fox | VG | Abdominal Abscess | MCR replacement, LOA 6/3/13. Day 3 6/15/13 |

| Ref Date | Patient Name | Location | Referral Source | Coverage | Admit Date | Accepting MD | CL | Diagnosis | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 6/4 | Redacted | Scripps Green | | MCR | | Zawitkowski | VG | Wound Care | LOA Scripps Green 6/4/13,out admitted for debridement, day 3 6/6/13 |

| Patient Name | Location | Referral Source | Coverage | Admit Date | Accepting MD | CL | Diagnosis | Comments |
|---|---|---|---|---|---|---|---|---|
| Redacted | Bulboa | Dr. Portow | MCR/Tricare | | Fox | ME | Hypotension, bleeding | LOA 4/17/13, day3 4/19/13 |

| Ref Date | Patient Name | Location | Referral Source | Coverage | Admit Date | Accepting MD | CL | Diagnosis | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 1/8 | Redacted | Mercy | | MCR/MCAL | | Sullivan | JM | CT Scan | LOA 3days 1/11/13, 9th day 1/16/13 |

date at which the patient can be readmitted. See Paragraph 46 for representative examples.

50.    This corporate policy was communicated repeatedly in daily and weekly meetings with clinical liaisons and well as monthly "profit and loss" meetings with case managers as explained in Paragraph 47.

### 3.    Six-Sixth's Stay Scheme

51.    Relator observed that Vibra's policy is to keep federally-insured beds occupied regardless of the patient's actual healthcare needs. The law requires that the average patient length of stay in an LTCH be greater than 25 days in order to qualify for reimbursement as a long-term acute care facility. If the 25-day benchmark is not exceeded, the facility will no longer be considered an LTCH and will not be subject to a different reimbursement plan, which can potentially be less lucrative.  In order to maintain this 25-day average stay and remain eligible for reimbursement, Vibra engages in a practice of manipulating admissions and discharges. Since these admissions and discharges are not based on patient need but rather on a desire to manipulate a facility wide patient average length of stay, the practice results in submitting false reports and claims to Medicare.

52.    Partly, as a result of manipulating the length of patient stays under the "less than three-day" interruption of stay and the "greater than three-day" interruption of stay schemes, Vibra routinely has an average patient length of stay that is less than 25 days. In order to compensate for this irregularity, Vibra routinely keeps patients in their LTCH facilities longer than is medically necessary in order to exceed the 25-day benchmark. For instance, many patients who are medically prepared to be discharged at five-sixths time are kept in the LTCH for the total length of stay (or six-sixths) specified in their DRG. This additional time amounts to worthless services since patients do not need to be in the facility and as such do not receive attentive care.

53.     Vibra has a pervasive policy of accepting patients solely based on their ability to meet the Medicare benchmarks. Indeed, Relator and other Vibra employees were routinely told "don't bring a patient in who is Medicare who can't stay 25 days."

54.     Relator also discussed this policy with former District Marketing Manager Chris Yarnovich. Mr. Yarnovich approached Relator about her decision to admit a short stay Medicare patient who would not be staying at the LTCH for 25 days. Mr. Yarnovich expressed concern that Relator admitted a patient who did not need to stay in the facility for 25 days despite the patient meeting admission criteria.

## VI.     KNOWING CONDUCT

55.     Vibra has engaged in the conduct alleged herein on a national basis, at the direction or with the direct involvement of executives at the highest levels of Vibra San Diego and Vibra Corporate.  These executives include Vibra Regional CEO Timothy Patten, Vibra San Diego CEO Natalie Germuska, former District Marketing Manager for Vibra San Diego Chris Yarnovich, Vibra Corporate COO, and former CEOs Tim Clark and Michael Philips.

56.     All claims submitted or caused to be submitted for reimbursement to Federal health-care programs which were tainted by Vibra's kickback and Stark violations, violate the FCA.

## COUNT I
## PRESENTING FALSE CLAIMS
## (FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A))

57.     The Relator realleges and incorporates by reference the allegations in the previous paragraphs of this Complaint.

58.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-3732.

59.   By virtue of the acts described above, Defendants knowingly submitted, caused to be submitted and continue to submit and cause to be submitted false or fraudulent claims for payment by the United States, by knowingly or recklessly submitting claims to Federal health-care programs for inflated reimbursements as a result of manipulated patient stays and for services furnished by Vibra-controlled LTCHs as a result of patient referrals for which the LTCHs paid kickbacks to their medical directors in violation of the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b).

60.   Defendants knowingly submitted, caused to be submitted and continue to submit and cause to be submitted false or fraudulent claims for payment by the United States, by knowingly and recklessly submitting claims to Medicare for inflated reimbursements as a result of manipulated patient stays and for services furnished by Vibra-controlled LTCHs as a result of abusive self-referrals provided by medical directors in violation of the Stark Act, 42 U.S.C. § 1395nn.

61.   The United States, unaware of Defendants' kickbacks, tainted referrals, and manipulation of patients' length of stay in Vibra facilities, and in reliance on Defendants' compliance with the law, paid false claims when it paid for inflated reimbursements as a result of manipulated patient stays and reimbursed Defendants for services furnished as a result of the referrals for which Defendants paid kickbacks.

62.   The falsity of the claims presented by Defendants was material, as the falsity concealed material violations of the AKS, the Stark Act, and the FCA that would have justified denial of their claims in their entirety.

63.   Had Federal health-care officials known of Defendants' kickbacks, tainted referrals, and manipulation of patients' length of stay in LTCHs, the

Government would not have paid Defendants for the services furnished as a result of kickbacks and this manipulation.

64.    Defendants' knowing presentation of false claims for payment by the United States has violated 31 U.S.C. § 3729(a)(1)(A) and has damaged, and continues to damage, the United States in an amount to be determined at trial.

**COUNT 2**
**PRESENTING FALSE REPORTS**
**(FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B))**

65.    The Relator realleges and incorporates by reference the allegations in the previous Paragraphs of this Complaint.

66.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-3732.

67.    By virtue of the acts described above, Defendants knowingly made, caused to be made and continue to make and cause to be made false or fraudulent records that were material to a false or fraudulent claim for payment by the United States, by knowingly or recklessly submitting reports to Medicare for inflated reimbursements as a result of manipulated patient stays and for services furnished by Vibra-controlled LTCHs as a result of patient referrals for which the LTCHs paid kickbacks to their medical directors in violation of the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b).

68.    Defendants knowingly made, caused to be made and continue to make and cause to be made false or fraudulent records that are material to a false or fraudulent claim for payment by the United States, by knowingly or recklessly submitting reports to Medicare for inflated reimbursement as a result of manipulated patient stays and for services furnished by Vibra-controlled LTCHs as a result of abusive self-referrals by medical directors in violation of the Stark Act, 42 U.S.C. § 1395nn.